RECEIVED
IN LAKE CHARLES, LA

JAN 17 2014

TONY R. MOORE, CLERK
BY_____ DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | |
|---|---|
| CHAQUITHA ROSHAWN NELSON | * CIVIL ACTION NO. 2:11-CV-1377 |
| Plaintiff | * |
| V. | * |
| LAKE CHARLES STEVEDORES, L.L.C., INTERNATIONAL LONGSHOREMAN'S ASSOCIATION, INC., INTERNATIONAL LONGSHOREMAN'S ASSOCIATION LOCAL NO. 2047, & MARVIN COLE, SR. | * JUDGE MINALDI |
| | * MAGISTRATE JUDGE KAY |
| Defendants | * |

## MEMORANDUM RULING

Before the court is a Motion for Summary Judgment [Doc. 48], filed by the defendant, Lake Charles Stevedores, L.L.C. (LCS). The plaintiff has filed a Memorandum in Opposition [Doc. 51], and LCS has filed a Reply [Doc. 55]. For the following reasons, the Motion is **GRANTED IN PART, AND DENIED IN PART.**

## FACTS & PROCEDURAL HISTORY

This suit arises from alleged sexual harassment and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.*[1] The plaintiff is a female, African-American citizen who was first employed by LCS loading cargo at the Port of Lake Charles in October, 2008.[2] LCS is one of three stevedoring companies operating at the Port of Lake Charles.[3] The International Longshoreman's Union Local No. 2047 (Local 2047) assisted LCS with the hiring

---

[1] Am. Compl. [Doc. 4] at ¶ 1.1.
[2] *Id.* at ¶ 5.1. The plaintiff joined Local 2047 in March, 2009. Depo. of Chaquitha R. Nelson [Doc. 48-3], at 17.
[3] Aff. of Thomas Flanagan [Doc. 48-5], at ¶ 3.

1

of workers at the port.[4] Marvin Cole was employed as a walking foreman at the job site when the alleged incidents giving rise to this lawsuit occurred.[5] Walking foreman is a supervisory position that oversees a number of "gang foremen," who themselves oversee a number of working stevedores.[6]

In order to obtain work for the following day, union members such as the plaintiff would call a phone number to determine what jobs would be available at the Port the next day.[7] The worker would then report to the union hall the following day in hopes of being selected for work by a gang foreman.[8] Such selections were based on seniority. All three stevedoring services licensed to do work at the port, including LCS, drew workers from Local 2047 on a day-to-day basis subject to the terms of the collective bargaining agreement (CBA).[9]

On June 14, 2009, the allegedly harassing behavior commenced when Mr. Cole allegedly inquired of the plaintiff what type of panties she was wearing.[10] The plaintiff, averting her eyes, embarrassed, was then asked by Mr. Cole whether something was wrong, if, for instance, she was "gay or something."[11] The plaintiff then excused herself to go to the restroom, and upon returning to work again found herself in a conversation with Mr. Cole. The plaintiff stated that she needed to return to her work loading cargo, to which Mr. Cole responded that "all you have to do is shake your butt at them. If you shake your butt, they'll be able to throw the bags."[12]

---

[4] Am. Compl. [Doc. 4] at ¶ 5.1. According to the plaintiff's Amended Complaint, both the defendant, Marvin Cole, and the plaintiff were dues paying members of the Union. "Nonetheless, the Union refused to or failed to represent [the plaintiff] for any of the claims giving rise to this cause of action." *Id.* at ¶ 5.2.
[5] Depo. of Chaquitha R. Nelson [Doc. 48-3], at 28.
[6] *Id.* at 28-29.
[7] Memo. in Supp. [Doc. 48-1], at 7.
[8] *Id.*
[9] *Id.*
[10] Depo. of Chaquitha R. Nelson [Doc. 48-3]. at 38.
[11] *Id.*
[12] *Id.* at 41. These comments were allegedly overheard by Mr. Willie Watts, another employee. *Id.*

Several hours after these initial interactions, at the end of the workday, the plaintiff requested several of her male coworkers to wait for her to exit the hold of the ship because she did not wish to walk past Mr. Cole again by herself.[13] When she passed by Mr. Cole, he "had something in his hands . . . and he took it and popped [the plaintiff] on the butt with it."[14] Upon seeing that the plaintiff was upset, Mr. Cole began repeatedly apologizing.[15]

The plaintiff thereafter informed Glen Lewis, the business agent for Local 2047, of the incident.[16] Mr. Lewis phoned Lash Chretien, the president of Local 2047, in the presence of the plaintiff, and said that "we have to do something about him," referring to Mr. Cole.[17] Mr. Lewis further stated that this was the second time something of this nature had transpired involving Mr. Cole.[18] Mr. Lewis completed a formal charge at this point.[19] Several days later, the plaintiff spoke to LCS's accountant, Gabriella Snell, about the incident as well.[20]

At a subsequent meeting, Mr. Lewis instructed the plaintiff not to speak to Mr. Cole. The plaintiff alleges that she was instructed that if she "said anything to Marvin that they was [sic] going to have [her] escorted from the port by the police."[21]

The plaintiff met with Rick Cormier, business manager at LCS, and Gabriella Snell on June 18, 2009.[22] Cormier and Snell then met with Mr. Cole, who denied the allegations.[23]

---

[13] *Id.* at 47.
[14] Depo. of Chaquitha R. Nelson [Doc. 48-3], at 48.
[15] *Id.*
[16] *Id.* at 54.
[17] *Id.* at 56.
[18] *Id.* at 56.
[19] *Id.* at 57.
[20] Depo. of Chaquitha R. Nelson [Doc. 48-3], at 66-70.
[21] *Id.* at 71.
[22] Memo. in Supp. [Doc. 48-1], at 10.
[23] *Id.*

However, Mr. Cormier cautioned Cole regarding the consequences of any acts of retaliation against the plaintiff for her having submitted a formal complaint.[24]

Following these incidents, the plaintiff alleges that she was retaliated against for her pursuing a complaint with the Equal Opportunity Employment Commission (E.E.O.C.) against Mr. Cole. She alleges that, on multiple occasions, Mr. James Williams, one of the foremen, refused to hire the plaintiff for subsequent work; however, Mr. Williams ultimately relented when he was ordered to hire her by Mr. Lewis.[25] Another gang foreman, Vic Guidry, allegedly gave work to a less senior male worker over the plaintiff, despite the rule that work is doled out to union members based on seniority.[26] Willie Watts, another gang foreman, also allegedly told the plaintiff on many occasions that he had been instructed by Local 2047 not to hire her.[27] On another occasion, the plaintiff had to leave work due to illness while working for Mr. Eddie White, another foreman; although the typical protocol would allow for the foreman to get a replacement for the absent worker, the plaintiff alleges that no replacement was provided and that she was improperly punished in the form of a seven day suspension as a result of the incident.[28]

On another occasion, the plaintiff alleges that she was physically threatened by Mr. John Peters in 2011. Mr. Peters did not want to hire the plaintiff, and told the plaintiff to speak with Mr. Lewis about it if she had a problem. In Mr. Lewis' office, Mr. Peters was allegedly being held back by others says "I'm going to do her something."[29] The plaintiff was afraid to the point

---

[24] *Id.*
[25] Depo. of Chaquitha R. Nelson [Doc. 48-3], at 72-73.
[26] Depo. of Chaquitha R. Nelson [Doc. 48-3], at 76-77.
[27] *Id.* at 80-81.
[28] *Id.* at 95-96.
[29] *Id.* at 113.

that she dialed 9-1-1. The police came and took a report, but apparently no one else spoke to the police.[30]

There were also incidents with another gang foreman, Mr. James Williams. Mr. Williams repeatedly used what has been described as "rough language" with the plaintiff, such as "I know you hear me with your black ass, your ignorant ass. . . . I don't have to hire your black ignorant ass."[31] On a separate occasion, Mr. Williams stated that he was "sick" of the plaintiff, and that she was "going to be in a fire or something."[32]

There was also an allegation that Thomas Flanagan, owner and managing member of LCS, dismissed the plaintiff from work one day.[33] While the plaintiff felt that it was in retaliation for her having filed a complaint with the E.E.O.C., these allegations have been denied by LCS.[34]

These events resulted in the plaintiff's seeking counseling from a rape crisis center to get over what she has stated she interpreted as a sexual assault and sexual harassment.[35] The plaintiff continued to work at LCS through Local 2047 until May, 2013, when she ceased working at the Port because there was no more work to be had.[36]

The plaintiff filed suit on July 22, 2011, after receiving a Notice of Right to Sue from the E.E.O.C.[37] The plaintiff sued for equitable relief, and compensatory and punitive damages from LCS, International Longshoreman's Association, Inc. (ILA), Local 2047, and Marvin Cole, under theories of sexual discrimination, retaliation, breach of contract and breach of the fair duty

---

[30] *Id.* at 114-15.
[31] *Id.* at 117-18. It should be noted that Mr. Williams is also an African-American.
[32] *Id.* at 120.
[33] Am. Compl. [Doc. 4], at ¶ 5.8.
[34] LCS's Answer [Doc. 11], at ¶ 5.8.
[35] Am. Compl. [Doc. 4], at ¶ 5.5.
[36] Depo. of Chaquitha R. Nelson [Doc. 48-3], at 93.
[37] *See generally* Compl. [Doc. 1].

of representation, ratification and respondeat superior, and gross negligence.[38] The ILA then filed a Motion to Dismiss, essentially arguing that dismissal was appropriate pursuant to Federal Rule of Civil Procedure 12(b)(1) on the basis of a lack of subject matter jurisdiction because administrative charges were never filed against the ILA, as required by Title VII.[39] The court granted the motion on October 17, 2012, dismissing all of the plaintiff's claims against ILA.[40] LCS filed the instant Motion on November 12, 2013, seeking a grant of summary judgment in its favor on all of the plaintiff's remaining claims against it.

## LAW & ANALYSIS

A grant of summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. PRO. 56(a). A dispute over a material fact "is genuine if the evidence is such that a reasonable jury could not return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All evidence is considered is the light most favorable to the nonmoving party, and all reasonable inferences are drawn in that party's favor. *Jenkins v. Cleco Power, L.L.C.*, 487 F.3d 309, 313-14 (5th Cir. 2007) (citations omitted). "[I]n arguing that a genuine issue of material fact exists that precludes summary judgment, the non-movant must identify specific evidence in the record to support its position." *Toups v. Moreno Group, L.L.C.*, No. 11-1559, 2013 U.S. Dist. LEXIS 39695, at *15 (W.D. La. Mar. 21, 2013) (citation omitted). In assessing a motion for summary judgment, a court is not to make any credibility determinations. *Roberts v. Cardinal Servs.*, 266 F.3d 368, 373 (5th Cir. 2001) (citation omitted). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an

---

[38] Am. Compl. [Doc. 4], at ¶¶ 4.2 – 4.5, 6.1 –13.4.
[39] Mot. to Dismiss [Doc. 28], at 1.
[40] Memo. Ruling [Doc. 33].

element essential to that party's case, and on which that party will bear the burden of proof at trial." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citation omitted).

SEXUAL HARASSMENT CLAIM

**LCS' Status as a Title VII Employer**

Title VII makes it "an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. 2000e-2(a)(1). An "employer" is defined as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person." 42 U.S.C. § 2000e(b). In order to be held liable under Title VII, an employer must first meet the statutory definition, and must also have an "employment relationship" with the plaintiff. *McNeal v. David Zerkel Sales, Ltd.*, No. 10-cv-1723, 2011 U.S. Dist. LEXIS 82236 at *7 (W.D. La. May 12, 2011) (*citing Deal v. State Farm*, 5 F.3d 117, 118 n.2 (5th Cir. 1993)). *See also Muhammad v. Dallas Cnty. Cmty. Supervision & Corr. Dep't*, 479 F.3d 377, 380 (5th Cir. 2007).

To determine whether an employment relationship exists for purposes of Title VII, the Fifth Circuit employs the "hybrid economic realities/common law control test." *Id.* "The right to control an employee's conduct is the most important component of this test." *Deal*, 5 F.3d at 119 (*citing Fields v. Hallsville Indep. Sch. Dist.*, 906 F.2d 1017, 1019 (5th Cir. 1990)). As to the control component, courts look to whether the "alleged employer" is empowered to "hire, fire, supervise, and set the work schedule of the employee." *Muhammad*, 479 F.3d at 380 (citation omitted). The "economic realities" component of the test "focuses on 'whether the alleged

employer paid the employee's salary, withheld taxes, provided benefits, and set the terms and conditions of employment.'" *Id.* (citation omitted).

LCS first argues that it is not liable for sexual harassment to the plaintiff as a matter of law because LCS was not the plaintiff's Title VII employer.[41] The dispute as to whether LCS is an "employer" stems from the nature of the previously described relationship between LCS and Local 2047—namely, that LCS "hires" union workers on an as-needed, day-to-day basis. Local 2047 "furnished labor on a day-to-day basis, as needed" to LCS.[42] LCS contends that it "had no right to hire, fire, or supervise those longshoremen referred to it by Local 2047."[43] However, LCS placed orders for needed workers for particular jobs.[44] It would not be a stretch to construe this as "hiring." In this way, LCS also had significant control over the work schedules of the stevedores in its employ.

Labor was furnished to LCS by Local 2047 subject to the terms and conditions of the collective bargaining agreement (CBA).[45] The CBA states that it is an "Agreement Entered Into Between The Owners and/or Operators and/or Agents, and/or Terminal Operators . . . including the Port of Lake Charles, Louisiana, subscribed for by the West Gulf Maritime Association, and their respective regular and associate members, hereinafter styled First Parties," which would include LCS, "and . . . Local No. 2047 of Lake Charles, Louisiana, hereinafter styled Second Parties."[46] It goes on to state that the "direct employer shall have the right to hire additional men over minimum gang sizes . . . to perform work anywhere on the operations."[47] The CBA further states that

---

[41] Memo. in Supp. [Doc. 48-1], at 13.
[42] Aff. of Thomas Flanagan [Doc. 48-5], at ¶ 4.
[43] Memo. in Supp. [Doc. 48-1], at 15.
[44] Aff. of Thomas Flanagan [Doc. 48-5], at ¶ 7.
[45] *Id.* at ¶ 5.
[46] CBA [Doc. 48-5], at 4.
[47] *Id.* at 27.

> The Parties hereto agree that any individual(s) employed under the terms of the Agreement who leave the job without prior approval of the direct employer or otherwise abandons his duties or who is unwilling or does not perform his duties as required by the direct employer or who improperly handles or deliberately damages equipment and/or cargo shall be deemed to have violated the Agreement and shall be subject to discipline up to and including termination.[48]

This language indicates that LCS would be empowered to terminate union workers' employment with LCS for failure to live up to their obligations under the CBA. This is further supported by Mr. Cormier's statements to Mr. Cole to the effect that his behavior "would not be tolerated and he would be discharged" if such behavior continued.[49] Given that LCS could effectively hire and fire union members, as well as determine when they could work, the control component of the test is satisfied.

LCS next contends that the economic realities prong of the test is not met because "LCS did not pay salaries to, withhold taxes on behalf of, pay benefits to, or set the terms and conditions of employment for the longshoremen referred to it by Local 2047."[50] However, seemingly in direct conflict with this assertion is the affidavit of Thomas Flanagan, which states that "LCS paid wages to longshoremen referred to it by Local 2047 through the West Gulf Maritime Association (WMGA), a trade association that provides various services to stevedoring companies, including payroll processing."[51] The court does not consider the fact that the employees' wages were paid through an intermediary to be particularly significant in making this determination. Further, the terms and conditions of employment were set by the CBA.[52] Since the CBA is the result of negotiations between parties representing LCS and those parties representing Local 2047, LCS had at least some hand in crafting the terms and conditions of

---

[48] *Id.* at 5.
[49] Aff. of Richard Cormier [Doc. 48-6], at 3.
[50] Memo. in Supp. [Doc. 48-1], at 15.
[51] Aff. of Thomas Flanagan [Doc. 48-5], at ¶ 11.
[52] *Id.* at ¶ 15.

employment. As a result of the foregoing, the court finds that the hybrid economic realities/common law control test is satisfied, and that LCS is the plaintiff's Title VII employer as a matter of law.

### Hostile Work Environment

An employer's liability for workplace harassment varies depending on the status of the alleged harasser as either a co-worker or a supervisor. *E.E.O.C. v. Boh Bros. Const. Co., L.L.C.*, 731 F.3d 444, 452 (5th Cir. 2013). "If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions."[53] *Id.* (*citing Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2439 (2013)). However, where the alleged harassment is committed by a supervisor, in order to recover in a harassment claim, a plaintiff must show "(1) that the employee belongs to a protected class; (2) that the employee was subject to unwelcome sexual harassment; (3) that the harassment was based on [a protected characteristic]; and (4) that the harassment affected a 'term, condition, or privilege' of employment[,]" *Id.* at 453 (*citing Lauderdale v. Tex. Dep't of Criminal Justice*, 512 F.3d 157, 162-63 (5th Cir. 2007)).

LCS argues that Marvin Cole, the alleged harasser, "was not a supervisor because he was not empowered by LCS to take tangible employment actions against [the] plaintiff."[54] "An employee is a supervisor if 'he or she is empowered by the employer to take tangible employment actions against the victim.'" *Boh Bros. Constr. Co., L.L.C.*, 731 F.3d at 452-53 (*citing Vance*, 133 S. Ct. at 2439). Such actions include the ability to effect a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly

---

[53] In such a situation, additional considerations include whether a tangible employment action was taken, and whether the employer could successfully assert the recognized affirmative defense by making a showing that "(1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided." *Boh Bros. Const. Co., L.L.C.*, 731 F.3d at 452 (*citing Vance*, 133 S. Ct. at 2439).

[54] Memo. in Supp. [Doc. 48-1], at 19.

10

different responsibilities, or a decision causing a significant change in benefits." *Vance*, 133 S. Ct. at 2443 (*citing Burlington Indus. V. Ellerth*, 524 U.S. 742, 761 (1998)).

Affidavit evidence submitted by LCS stated that "LCS never granted Marvin Cole authority to do anything on its behalf, let alone take tangible employment action of any kind against Chaquitha Nelson or any other longshoreman. LCS was contractually bound through the CBA to abide by the core gang system of management."[55] Nevertheless, it seems that under the core gang system, the gang foremen are permitted each morning to select who will, or will not, be in their gang; in other words, they select who will work. Mr. Cole, as previously stated, was a walking foreman, senior to the gang foremen. If the gang foremen are empowered to select which of approximately equally senior stevedores will work on a given day, that power constitutes a decision which can cause a significant change in benefits—namely, that is the power to control whether a union member works and gets paid at all. As Mr. Cole was senior to the gang foremen, he would be in a position to exert considerable influence over the gang foremen's selections. As Mr. Cole's status as a walking foreman gave him the ability to have decision-making power which could result in a significant change in benefits for the plaintiff, he was in fact that plaintiff's supervisor for Title VII purposes.

LCS next argues that the plaintiff may not recover because the alleged harassment in question did not affect a term, condition, or privilege of her employment, and therefore the plaintiff has not made a sufficient showing to satisfy the aforementioned fourth element required to establish a prima facie case for sexual harassment.[56] "To affect a term, condition, or privilege of employment, the harassing conduct 'must be sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment." *Boh*

---

[55] Aff. of Thomas Flanagan [Doc. 48-5], at ¶ 18.
[56] Memo. in Supp. [Doc. 48-1], at 16.

11

*Bros. Const. Co., L.L.C.*, 731 F.3d at 453 (citing *Aryain v. Wal-Mart Stores of Tex., L.P.*, 534 F.3d 473, 479 (5th Cir. 2008) (additional citation omitted)). A "reasonable person" standard is employed to evaluate severity and pervasiveness. *Id.* (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998)). *See also Aryain*, 534 F.3d at 479 (citation omitted) (stating that the "environment must be deemed 'both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so'").

Courts use a totality of the circumstances analysis to assess whether a work environment is objectively hostile or abusive. *Watkins v. Rec. & Park Comm'n for Baton Rouge*, No. 12-366-SCR, 2013 U.S. Dist. LEXIS 180348, at *16 (M.D. La. Dec. 26, 2013). "Courts look to: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating as opposed to a mere offensive utterance; (4) whether it unreasonably interferes with an employee's work performance, and (5) whether the conduct undermines the plaintiff's workplace competence." *Id.* (citing *Hockman v. Westward Communications, L.L.C.*, 407 F.3d 317, 325-26 (5th Cir. 2004) (additional citation omitted)). Title VII is not, however, meant to be a "general civility code" for all workplace incidents involving bad taste, boorish behavior, and all manner of unwelcome advances. "'Simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Lauderdale*, 512 F.3d at 163 (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

It should further be noted that the test for pervasiveness or severity is stated in the disjunctive. Thus, "[a]n egregious, yet isolated, incident can alter the terms, conditions, or privileges of employment and satisfy the fourth element necessary to constitute a hostile work

environment." *Id.* (*citing Harvill v. Westward Communications, L.L.C.*, 433 F.3d 328, 434-35 (5th Cir. 2005)). On the other hand, repeated, frequent incidents of harassment, although less severe in nature, "can reach the level of 'pervasive,' thereby altering the terms, conditions, or privileges of employment such that a hostile work environment exists." *Id.*

The conduct in question herein was infrequent in nature, occurring over the course of a single workday. As such, to make a showing for harassment, the conduct in question is required to be more severe in nature than if it had occurred over a prolonged period of time. While the plaintiff's allegations regarding Mr. Cole's behavior, if true, reveal behavior that is unquestionably offensive, unprofessional, inappropriately invasive and extremely childish, its severity is somewhat less than what has been held by other courts to be necessary in order to sustain a claim under Title VII. In *McClinton v. Sam's East, Inc.*, No. 11-cv-2156, 2012 U.S. Dist. LEXIS 141013 (W.D. La. Sept. 28, 2012), the plaintiff alleged that his manager tapped him on his "butt and said nice an tight [sic]." *Id.* at *3. A similar incident followed, as well as an unwelcome hug, and another embrace wherein the manager said that the two "could be a great team together if [the plaintiff] would just play ball." *Id.* at 4. In granting the defendant's motion to dismiss, the court in *McClinton* stated that the alleged hugging and commentary in question "certainly [did] not rise to the level of the touching in *Waltman v. Int'l Paper Co.*, 875 F.2d 468 (5th Cir. 1989),"[57] nor to that level found in either *Harvill*[58] or *Paul v. Northrop Grumman Ship Sys.*, 309 Fed. Appx. 825 (5th Cir. 2009),[59] and the *McClinton* plaintiff did not allege the type of

---

[57] In *Waltman*, summary judgment for the defendant was reversed where the supervisor urged the plaintiff to have sex with a co-worker, broadcast obscenities regard the plaintiff over a public address system, used pliers to pinch the plaintiff's buttocks, and placed over thirty pornographic notes in the plaintiff's locker, among other egregious behavior. *Waltman*, 875 F.2d at 470-71.

[58] In *Harvill*, the plaintiff, over a seven month period, was subjected to frequent and repeated unwelcome touching and fondling by her supervisor, as well as comments and inquiries into her sex life despite her repeated protests. *Harvill*, 309 Fed. Appx. at 435-36.

[59] The *Paul* court upheld a grant of summary judgment for the defendant where an employee had touched the plaintiff's breasts and stared at her in an intimidating manner, rubbed the plaintiff's buttocks, and wrapped his arms

extended harassment found in either *Harvill* or *McKinnis v. Crescent Guardian, Inc.*, 189 Fed. Appx. 307, 310 (5th Cir. 2006). The court is particularly persuaded by the Fifth Circuit's holding in *Paul*, where summary judgment was granted for the defendant despite the occurrence of conduct that was arguably more egregious than what transpired in the instant case. *See supra* note 59. Moreover, the conduct in question here, though perhaps embarrassing to the plaintiff, was not physically threatening, nor did it persistently affect her ability to do her job or affect her workplace competence. Under these facts, accepting all of the plaintiff's allegations as true, and consistent with the jurisprudence of this circuit, the court finds that the plaintiff's Title VII claim for sexual harassment against LCS fails as a matter of law due to a lack of sufficient severity or pervasiveness. Accordingly,

**IT IS ORDERED** that LCS's Motion for Summary Judgment [Doc. 48] be and hereby is **GRANTED** as to the plaintiff's claim for sexual harassment.

### RETALIATION CLAIM

LCS next seeks the dismissal of the plaintiff's Title VII claim for retaliation. To make a prima facie case for retaliation, a plaintiff must show that "(1) she engaged in protected activity; (2) an adverse employment action occurred; and (3) a causal link exists between the protected activity and the adverse employment action." *Royal v. C.C.C. & R. Tres Arboles, L.L.C.*, 736 F.3d 396, 400 (5th Cir. 2013) (citations omitted). Engaging in a protected activity includes making a charge or "'participat[ing] in any manner in an investigation, proceeding, or hearing' under Title VII." *Carter v. Target Corp.*, No. 13-30213, 2013 U.S. App. LEXIS 20413, at *10 (5th Cir. Oct. 4, 2013) (citation omitted). "Generally, a plaintiff who files a complaint with the EEOC engages in a protected activity." *Id.* (citation omitted).

---

around her waist. *Paul*, 309 Fed. Appx. at 826-27. The incident in *Paul* also occurred over the course of a single day.

LCS argues that the plaintiff's retaliation claim must fail because LCS was not the plaintiff's Title VII employer.[60] As it has already been determined that LCS was the plaintiff's Title VII employer, this argument fails.

LCS next argues that the plaintiff's retaliation claim must fail because LCS did not take any adverse employment action against the plaintiff.[61] The Fifth Circuit recently stated that

> [b]ecause the language of the anti-discrimination and anti-retaliation provisions differ, an adverse employment action is defined differently for each provision. With respect to a claim of retaliation, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."

*Harrison v. Corr. Corp. of Am.*, 476 Fed. Appx. 40, 44 (5th Cir. 2012) (internal citations omitted).

The plaintiff has asserted numerous instances of gang foremen failing to select her for work on a given day, despite her status in the seniority hierarchy. The alleged denial of work, and thus the denial of a paycheck, certainly arises to the level of material adversity, and the prospect of such would likely be sufficient to dissuade a reasonable worker from making a charge of discrimination.

LCS argues that such denials of work "cannot possibly be attributed to LCS simply because LCS has zero control over who Local 2047 sends to the worksite."[62] While LCS may not have any control over which members of Local 2047 showed up at the union hall on a given day, LCS certainly had control over which members of Local 2047 worked and which did not. This is clearly demonstrated from the prior discussion concerning LCS's status as a Title VII employer, as well as the affidavit of LCS manager, Richard Cormier, which stated that, in Mr.

---

[60] Memo. in Supp. [Doc. 48-1], at 21.
[61] *Id.*
[62] Memo. in Supp. [Doc. 48-1], at 22.

15

Cormier's initial discussion with Mr. Cole regarding the incident, he advised Mr. Cole that he, Mr. Cormier, would discharge Mr. Cole for compromising the plaintiff's work in any way, retaliating against her, or intimidating her.[63] While this is certainly to Mr. Cormier's credit, it does demonstrate that LCS is empowered to decide, and has a large degree of control over, who does or does not work.

Thus, LCS was, in fact, in a position to levy adverse employment actions upon the plaintiff in the form of denying her placement on gangs, effectively denying her a living. If LCS actually engaged in such behavior, then the second element required for a retaliation claim—that an adverse employment action occurred—is met. However, LCS denied in their Answer [Doc. 11] the plaintiff's allegations with regard to her having been denied placement on gangs for work by various foremen.[64] While it certainly seems unusual that the plaintiff continued to work with LCS until May, 2013, assuming that the plaintiff's allegations are true, whether or not she was subjected to adverse employment actions constitutes a genuine dispute of material fact that precludes a grant of summary judgment at this time. As such, the court will not address at this time the arguments regarding LCS's alternative argument as to whether a causal link existed between the plaintiff's filing of her E.E.O.C. complaint and the alleged adverse employment action. Accordingly,

**IT IS ORDERED** that LCS's Motion for Summary Judgment [Doc. 48] be and hereby is **DENIED** as to the plaintiff's Title VII claim for retaliation.

### RESPONDEAT SUPERIOR CLAIM

Louisiana law states that "[m]asters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are

---

[63] Aff. of Richard Cormier [Doc. 48-6], at 3-4.
[64] *See* LCS's Answer [Doc. 11], at 3 (denying the allegations of ¶ 5.7 of the plaintiff's Amended Complaint).

16

employed." LA. CIV. CODE ANN. art. 2320. To succeed on a claim under a theory of respondeat superior, the plaintiff must allege an "employer-employee relationship, that there was negligence on the part of the employee and that the tortious acts of the employee were committed in the course and scope of the employment." *Jenkins v. Jefferson Parish Sheriff's Office*, 402 So. 2d 669, 674 (La. 1981) (*citing Moreau v. Landry*, 305 So. 2d 671 (La. Ct. App. 1974)).

LCS argues that the plaintiff's respondeat superior claim fails because (1) there was no employment or agency relationship between Mr. Cole and LCS, and (2) because no actionable retaliation or harassment occurred.[65] As previously stated, an employment relationship did exist between Mr. Cole and LCS as a matter of law, and there are remaining disputes of material fact that preclude a finding as to whether or not retaliation did in fact occur. Accordingly,

**IT IS ORDERED** that LCS's Motion for Summary Judgment [Doc. 48] be and hereby is **DENIED** as to the plaintiff's claim based on a theory of respondeat superior.

### GROSS NEGLIGENCE CLAIM & PUNITIVE DAMAGES

The plaintiff's Amended Complaint [Doc. 4] makes a claim for gross negligence, stating that the "reckless, malicious, and/or intentional conduct on the part of the Defendants constitutes gross negligence," for which the plaintiff seeks punitive damages.[66] LCS's sole response to this claim is a one sentence reiteration of previously made arguments stating that LCS was not negligent in responding to the plaintiff's harassment claims.[67] The plaintiff's brief makes no argument in this regard. Under Louisiana law, "there is a general public policy against punitive damages." *Ross v. Conoco, Inc.*, 828 So. 2d 546, 555 (La. 2002). As such, a "fundamental tenet" of Louisiana law is that punitive damages are unavailable unless expressly authorized by statute. *Id.* (*citing Ricard v. State*, 390 So. 2d 882 (La. 1980)). As the plaintiff's

---

[65] Memo. in Supp. [Doc. 48-1], at 23.
[66] Am. Compl. [Doc. 4], at ¶10.4.
[67] Memo. in Supp. [Doc. 48-1], at 24.

Amended Complaint [Doc. 4] makes no such reference to any state statute in this regard, the court is left to assume that the plaintiff is characterizing her pursuit of punitive damages under applicable federal law as a claim for gross negligence.

"Title VII provides that '[a] complaining party may recover punitive damages under this section against a respondent . . . if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." *Green v. Wal-Mart Stores, Inc.*, No. 07-0929, 2008 U.S. Dist. LEXIS 106681, at *19 (W.D. La. Nov. 24, 2008) (*citing* 42 U.S.C. § 1981a(b)(1)). It should also be noted that "nothing in the text of the statute limits an award of punitive damages to cases in which the plaintiff also receives compensatory damages." *E.E.O.C. v. E.I. Du Pont de Nemours & Co.*, 480 F.3d 724, 733 (5th Cir. 2007) (citation omitted). In assessing a claim for punitive damages under 42 U.S.C. § 1981a, "the district court should evaluate 'the nature of the conduct in question, the wisdom of some form of pecuniary punishment, and the advisability of a deterrent.'" *Spiller v. Wal-Mart Stores*, No. 00-20707. 2001 U.S. App. LEXIS 31086 at*5 (5th Cir. Nov. 21, 2001).

The Fifth Circuit has stated that, even where discrimination is shown, "not every sufficient proof of pretext and discrimination is sufficient proof of malice or reckless indifference. Nor is there a useful litmus for marking the point at which proof of violation sufficient to impose liability becomes sufficient to also support a finding of malice or reckless indifference." *Hardin v. Caterpillar, Inc.*, 227 F.3d 268, 270 (5th Cir. 2000). Given the fact that the conduct here has already been determined to not have been of a sufficient degree of severity or pervasiveness to survive LCS's Motion for Summary Judgment as to the claim for sexual harassment, the fact that Mr. Cormier threatened Mr. Cole with termination for his behavior and

cautioned him against repeating it, as well as the fact that the plaintiff remained at the port until May, 2013, the court is disinclined to allow the recovery of Title VII punitive damages in this instance. Moreover, there is no evidence to indicate that the high threshold of either malice or reckless indifference has been met. Accordingly,

**IT IS ORDERED** that LCS's Motion for Summary Judgment [Doc. 48] be and hereby is **GRANTED** as to the plaintiff's claims for punitive damages.

### EQUITABLE RELIEF CLAIM

"Equitable relief is available under both Title VII and § 1981". *Gordon v. Jkp Enters.*, No. 01-20420, 2002 U.S. App. LEXIS 29270, at *19 (5th Cir. Apr. 9, 2002) (*citing* 42 U.S.C. § 2000e-5(g); *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 460 (1975); 42 U.S.C. § 1981).

> If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay . . . or any other equitable relief as the court deems appropriate.

42 U.S.C. § 2000e-5(g)(1).

The plaintiff here has requested front pay, front benefits, post-petition interest, and an award of all medical expenses.[68] Title VII permits the recovery of "equitable relief in the form of backpay and reinstatement, or front pay in lieu of reinstatement." *McFarlain v. Carrier Sales & Distrib., L.L.P.*, No. 04-1275, 2005 U.S. Dist. LEXIS 42464, at *4 (W.D. La. Aug. 16, 2005) (citation omitted). The court has broad discretion in determining equitable awards in Title VII cases. *Albright v. City of New Orleans*, 105 Fed. Appx. 552, 556 (5th Cir. 2004) (citations omitted). "Frontpay" is defined by Black's Law Dictionary as "[c]ourt-awarded compensation for the post-judgment effects of continuing employment discrimination." BLACK'S LAW

---

[68] Am. Compl. [Doc. 4], at ¶ 11.4-11.5.

DICTIONARY (9th ed. 2009). However, here, the plaintiff has not sought reinstatement, and, as such, it is difficult to see how the discrimination in question is continuing. Moreover, by her own admission, the plaintiff left her work at the port because the work opportunities dried up, not because of the alleged discrimination. In *Gordon*, the court denied injunctive relief, to which an award of front pay would have been pursuant, because the plaintiffs did not seek reinstatement, nor did they plan to seek employment with the defendant employer in the future. *Gordon*, 2002 U.S. App. LEXIS 29270, at *20. Under such circumstances, the court therein found that such relief would have been "unnecessary to the 'just disposition' of the action." *Id.* at *20-21. The court is of the same opinion in the instant case. Accordingly,

**IT IS ORDERED** that LCS's Motion for Summary Judgment [Doc. 48] be and hereby is **GRANTED** as to the plaintiff's requests for equitable relief.

**IT IS FURTHER ORDERED** that LCS's Motion for Summary Judgment [Doc. 48] be and hereby is **GRANTED** as to the plaintiff's request for court costs.

Lake Charles, Louisiana, this 15 day of January, 2014.

PATRICIA MINALDI
UNITED STATES DISTRICT JUDGE